UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NATHANIEL OGEDEGBE,
*Plaintiff*,

v.

TOWN OF LEESBURG,
*Defendant*.

No. 1:24-cv-1897-MSN-LRV

## MEMORANDUM OPINION AND ORDER

In this matter, Plaintiff Nathaniel Ogedegbe has asserted two claims against Defendant Town of Leesburg for Title VII race discrimination (Count I) and retaliation (Count II) in connection with his non-promotion to Stormwater and Environmental Manager, and being subjected to an audit pertaining to discrepancies in Defendant's stormwater management program and termination upon the audit's findings. ECF 14. After discovery, Defendant now moves for summary judgment as to both claims. ECF 53. For the reasons that follow, the Court will GRANT Defendant's Motion (ECF 53) and DISMISS this matter with prejudice.

## I.      BACKGROUND

### A.      Factual Background

The following facts are undisputed unless otherwise indicated.

#### 1.   Hiring for the Stormwater and Environmental Manager Position.

Plaintiff Nathaniel Ogedegbe is a Black man who worked for Defendant Town of Leesburg, first as a Senior Engineer in the Division of Plan Review beginning in 2002, and later as Stormwater Management Engineer in the Public Works Department from 2005 until his termination on August 11, 2023. ECF 54 Statement of Undisputed Material Facts ("SUMF") ¶¶ 1,

4, 5. Plaintiff has more than thirty years of civil engineering experience, but his experience managing direct reports is limited to supervising four people from 1997 to 2000. ECF 56 Statement of Additional Material Facts ("PSAMF") ¶ 1; ECF 56-1 at TOL2080–81; ECF 54-29 at 41–43. While Plaintiff holds a bachelor's degree in civil engineering, he is not a professional engineer and has twice failed the exam to become such. SUMF ¶¶ 2, 3. As Stormwater Management Engineer, Plaintiff was responsible for management of Defendant's stormwater management program and the MS4 general permit, which he has acknowledged. SUMF ¶¶ 6, 7.

In July 2022, Defendant posted the position of Stormwater and Environmental Manager, with required qualifications including: a Bachelor's degree in Civil Engineering, Environmental Science/Management or closely related field, or equivalent combination of education and experience; Virginia Department of Environmental Quality (DEQ) certifications to include Stormwater Management Combined Administrator; a minimum of five (5) years of progressive experience in storm water management, MS-4 permitting and/or solid waste management/operations experience; and a minimum of three (3) years of progressively responsible managerial/supervisory experience. SUMF ¶ 20. Defendant's hiring process typically included: (1) review by human resources ("HR") for minimum qualifications; (2) creation of an interview list by the hiring manager; and (3) a panel interview with the hiring manager, an HR representative, and a "third person who can add value to the panel." *Id*. ¶ 21 (citing ECF 54-36 at 17:16-22). Of the nineteen applicants for the position, five, including Plaintiff and Chad Minnick, were selected for panel interviews. SUMF ¶¶ 22–23. The panel interviews were conducted by HR representative Stephanie Young, Plan Review Department senior project manager Eric Meske, and Public Works Director Renee LaFollette, who asked the interviewees the same slate of questions and then

conferred to compare candidates.[1] ECF 54-34 at 42–44, 46-47, 50. Minnick was ultimately selected for the position in January 2023, though the process "took longer than usual."[2] SUMF ¶ 25. The decision not to offer the position to Plaintiff was not made until the interviews were complete and the panel reviewed all candidates, and Plaintiff was informed of his non-selection at an in-person meeting on January 26, 2023. SUMF ¶ 26; ECF 56-1 Ex. 5 at 198:11-14; ECF 54-29 at 191–92.

Minnick is a white man who holds a bachelor's degree in political science and a Master of Public Administration. SUMF ¶ 13; ECF 54-29 at 180:18-21. He does not have an engineering degree nor is he a licensed professional engineer. ECF 56-1 Ex. 1 at 11:21-12:8. Prior to joining Defendant, Minnick's experience included working as the Stormwater Coordinator and Program Manager for the City of Huntington, West Virginia from 2012 to 2017; the Stormwater Program Manager and Assistant Public Works Director for the City of Martinsburg, West Virginia from 2017 to 2019; the City Manager (including public works director, director of development and planning, finance director, and zoning code official), managing 30 employees, for the City of Weston, West Virginia from 2019 to 2020; and the Stormwater Administrator for the City of Manassas, Virginia from 2020 to his hiring by Defendant in January 2023. ECF 54-19. Minnick's application to Defendant also included the Stormwater Management Combined Administrator

---

[1]    Plaintiff cannot create a genuine dispute as to this fact simply because he "lacks sufficient information to dispute that every question was asked the same slate of questions based on the notes produced, and further that Ms. LaFollette's notes are missing from the application files produced in discovery." ECF 56 Response to Defendants' Statement of Facts ("RDSF") ¶ 24. Although some of LaFollette's interview notes were not located in discovery, other notes of her, Young, and Meske are made on the same question template, ECF 60-3, and LaFollete's unrebutted testimony provides that all candidates were asked the same slate of questions. Plaintiff argues for an adverse inference based on the failure to locate LaFollette's notes, but Plaintiff has not shown and cannot show that such an inference is warranted. *Odyssey Exploration, Inc. v. Shipwrecked and Abandoned SS Mantola*, 425 F. Supp. 3d 287, 292-93 (S.D.N.Y. 2019) (party requesting adverse inference on summary judgment must show party having control over evidence had obligation to timely produce, failed to timely produce with a culpable state of mind, and missing evidence is relevant and in fact exists).

[2]    LaFollette testified that "it was hard to find . . . qualified candidates. It took longer to get interviews scheduled because we were dealing with candidates from out of state as well. Then once we did make an offer, it took longer to solidify the acceptance than expected. So it was . . . a longer process than normal." ECF 54-30 at 35:7-13.

license from Virginia DEQ and detailed his experience managing stormwater management programs and MS4 permits. SUMF ¶ 15 (citing ECF 54-17).

LaFollette testified that, as the hiring manager, it was up to her to make the panel's final selection of the most appropriate or best candidate, but her decision was subject to approval and override by the town manager, who she agreed was "the ultimate authority." ECF 60-1 at 85; ECF 54-34 at 58:7-16. In explaining the selection of Minnick, LaFollette stated that in her view, Minnick was more qualified than Plaintiff despite his lack of engineering degree and limited engineering experience because of his "relevant experience," and "the presentation in the interview and being able to clearly explain what is involved in an MS4 permit program" in the "stressful environment of an interview" given that "this position is required to be put in front of electeds and residents in stressful situations, so they need to be able to clearly communicated in that type of environment." ECF 54-30 at 36-37:5, 38:15-22 ("So all of that factored together during the interview and then the committee's discussion afterwards, we all determined that . . . Mr. Minnick was the better candidate[.]"). Also considered were Minnick's application, relevant work history, the minimum and preferred qualifications, and his references. ECF 54-34 at 45–46, 58–61.

As for Plaintiff, LaFollette described his interview performance as "[d]ecent, but not stellar," explaining that he did not "clearly state and articulate everything associated with the MS4 permit program" in response to the "key question" of describing his understanding of the Virginia MS4 permit process. ECF 54-30 at 32:6-17, 37:10-20 (Plaintiff "did not answer the question with the detail that was expected . . . [of] someone with his level of experience in the Town's MS4 permit program . . . he needed to be able to clearly explain to the committee what was required of an MS4 permit program . . . he did not do that, where Mr. Minnick did."). Comparing Plaintiff's answer to Minnick's, LaFollete stated that Minnick's was "[s]uccint, detailed, and walked through

4

all six minimum control measures in detail, but succinctly," recounting that Minnick explained his prior management of two MS4 permit programs, was familiar with "supervising," "council and commission presentations," and had "dealt with an EPA consent decree in the past. So he presented very well with all of the information provided during his interview." *Id*. at 33:14-34:3.

Upon being informed of his non-selection on January 26, 2023, Plaintiff told Young and LaFollette that he did not feel valued and did not feel seen because "I put a lot to the Town." ECF 54-29 at 194:2-12. Several days later, on January 30, 2023, Plaintiff emailed LaFollette, stating that "[t]he lack of consideration, courtesy, and respect I've received through this process is very disappointing. Despite being an internal applicant with over 20 years of service, my contributions and hard work are clearly not valued . . . Given the length of time this search took and my surprise about the purpose of the meeting being to inform me I didn't get the job, it would have been more appropriate to schedule a separate time to ask questions about the status of my tasks . . . . This reinforced my feeling of not being valued, seen or respected . . . . I expected and deserved more." ECF 54-22. Neither Plaintiff's in-person statement nor his follow-on email mentioned race or discrimination, although Plaintiff agreed in his deposition testimony that he was "trying to express that [I was] being discriminated against."[3] ECF 54-29 at 194:15-196:12. Separately, Plaintiff has testified that he believes the hiring of Minnick, and not him, was racially discriminatory in light of Plaintiff's professional experiences and the fact that he is Black and Minnick is white. ECF 54-29 at 177–88.

### 2.  Plaintiff's Prior Job Performance

---

[3]    Plaintiff submits that his email expressed that he "felt that based on his prior complaints of discrimination, it was clear that he was being treated differently on account of his race." RDSF ¶ 32; *see also* PSAMF ¶ 2. However, the email does not mention discrimination nor his prior complaints, and the cited portion of his deposition testimony (ECF 56-1 Ex. 5 199:4-16) is not present in the record before the Court.

Plaintiff agrees that his performance was inconsistent over the course of his employment with Defendant. RDSF ¶ 33; ECF 54-36 at 13:11-15 ("his performance was up and down . . . Some years it appeared that he met expectations . . . but there were times that he appeared to perform below expectations."). In 2015, Plaintiff was placed on a performance improvement plan ("PIP"), which he successfully completed. ECF 54-7. But in October 2017, his performance was found to be "in need of improvement" and he was placed on progress checks on a three-month schedule. ECF 54-8. And, in 2018, Plaintiff was again placed on a PIP, which he again successfully completed. ECF 54-9; ECF 54-33 at 16:3-18:8; ECF 54-34 at 12:12-13:22. However, his 2018 performance evaluation was the lowest rating of "Below Expectations," ECF 54-10, and in 2023, he was consistently missing deadlines for plan review. ECF 54-34 at 76:8-22.

In February 2020, Phillip Jones was hired as Stormwater and Environmental Manager, becoming Plaintiff's direct supervisor. SUMF ¶ 34. During his tenure, Jones did not conduct an internal review of the stormwater management program to determine what state it was in, ECF 54-11 ¶ 10. In Plaintiff's last performance evaluation on July 21, 2022 for the year up to May 13, 2022, Jones gave Plaintiff an "exceeds expectations" rating. ECF 54-13. At that time, neither Jones, LaFollette, nor the Town were aware of any deficiencies with the stormwater management program later identified in the Audit.[4] ECF 54-11 ¶ 10; ECF 54-34 at 80:17-20.

When Minnick became Plaintiff's supervisor in February 2023, he also had concerns with Plaintiff's performance, which included: inaccurate reporting related to work, late work product, lack of project management, direct contact with a consultant in contravention of the chain of command, blaming others for not completing tasks that Plaintiff claimed they were responsible for

---

[4]    Defendant submits a recent declaration of Jones asserting various points that appear to call into question the veracity of his performance evaluations of Plaintiff. ECF 54-11. The Court need not address the bulk of his testimony and, as discussed below, will assume the accuracy of Jones' evaluations when they were made.

when those others denied having any knowledge of alleged responsibility, scheduling time off during a period when critical end of tasks were due, and allowing a certification with the state Department of Conservation and Recreation as part of the MS4 permit to lapse for more than a year.[5] SUMF ¶ 42 (citing ECF 54-30 at 59-62; ECF 54-31 at 34-44; ECF 54-35 at 16-21).

### 3. The Stormwater Management Program Audit

Upon Minnick's start as Stormwater and Environmental Manager in February 2023, LaFollette tasked him with reviewing the stormwater program and files "to make sure that we had the documentation necessary to be able to receive our next five-year [MS4] permit" as "we knew that the requirements . . . were going to be more stringent." ECF 54-34 at 65:22-66:7; ECF 54-35 at 32:10-12. LaFollette had not previously tasked anyone to conduct such a review. ECF 54-34 at 81:9-13. Minnick attempted to obtain relevant information from Plaintiff, but Minnick found it difficult to obtain the answers he sought. SUMF ¶ 44. As Minnick conducted his review of the MS4 program, he determined that the Town had been significantly underreporting the number of assets it was required to notify DEQ of annually.[6] SUMF ¶ 45. This was alarming because it exposed the Town to significant monetary penalties by DEQ and the risk of a DEQ consent decree. SUMF ¶ 46.

---

[5]    Plaintiff does not dispute any of this but separately states that he "endeavored to provide Mr. Minnick with the documents he requested" and Minnick sometimes ignored his emails to offer additional assistance. PSAMF ¶ 7 (citing ECF 56-1 Ex. 5 at 212:12-22, Ex. 9, Ex. 10). Plaintiff also believed that Minnick overly scrutinized Plaintiff's work and was aggressive and combative at the direction of LaFollette. PSAMF ¶ 6 (citing ECF 56-1 Ex. 5 at 207:22-208:20; 214:14-18). All of this, however, does not create a genuine dispute as to Minnick's impressions.

[6]    *See* ECF 54-34 at 82:1-10 ("There was significant discrepancies based on what had been reported to DEQ at roughly 224 assets that was closer to 460-some-odd assets that should have been reported."); ECF 54-35 at 29:3-18 ("It's significant and it depends because of all of the means he was using to track things, the digital map said one number, a spreadsheet said a completely different number, and either of those numbers were still off by about 200."). Plaintiff contends that he properly followed procedures and practices and denies that any disparity truly existed and further asserts that the number that Minnick discovered is "inconsistent with publicly available Town records" because the 2022 report he led reported 326 stormwater management facilities to DEQ. RDSF ¶ 45; ECF 56-1 Ex. 7 ¶¶ 26, 27. This does not account for all of the assets that apparently should have been reported according to Minnick, however, nor is it relevant to the fact of Minnick's determination.

When Minnick brought his findings to LaFollette, this was the first time the Town became aware of such deficiencies in the stormwater management program, and Minnick suggested that an external audit should be conducted. SUMF ¶ 47. The Town Manager authorized as much. *Id.* ¶ 48. Subsequently, GKY & Associates was selected to perform the independent, external audit. *Id.* ¶ 49. On May 2, 2023, Plaintiff was informed that an external audit was going to be conducted and that in the meantime, his laptop was being seized and network access suspended. *Id.* ¶ 50; ECF 54-24. Six days later, on May 8, 2023, Plaintiff filed a complaint with Josh Didawick, Defendant's HR director, which stated that:

> Immediately after starting the new role, Chad's reminders to meet deadlines, work overtime to make sure the work gets done, use of red text in emails to emphasize his points seem to assume I am not doing my job. Chad's communications have been hostile, condescending and offensive. His attitude shows that he feels he is superior to me and I feel that I am being targeted based on my race and nationality. There is no other explanation for the full reversal in treatment I have received from management.

SUMF ¶ 51 (citing ECF 54-24). Plaintiff has testified that the basis for his assertion that he was being targeted based on race and nationality was "[t]he way [Minnick] talks to me . . . . when you look at him, you could see the harshness in his face. I've never experienced that." ECF 54-29 at 269:5-9. An investigation of Plaintiff's complaint by a third-party law firm concluded on June 30, 2023 that Plaintiff's claims were not substantiated. SUMF ¶ 52.

The external audit was led by GKY's Senior Water Resources Planner, Douglas Fritz, who has significant experience with stormwater management and the MS4 program. *Id.* ¶ 53. Fritz has testified that the audit was not directed towards "any particular person or anything" but rather the stormwater management program and "where it was at the time," including requirement and permit compliance and "how to improve things moving forward to meet the concept of iterative

progress[.]"[7] ECF 54-32 at 19:11-22 ("There was no discussion on any particular person at all.");
*see also* ECF 54-35 at 9:22-10:16. During the audit, Minnick relayed to Fritz his concern with the
underreporting or tracking of best management practices ("BMPs" or stormwater management
facilities) and accordingly, maintenance of the BMPs and compliance with the MS4 permit. ECF
54-32 at 15:10-17:18. At the time Minnick conveyed this to Fritz, Fritz did not know if there was
a discrepancy. *Id.* at 16:11-13. In conducting the audit, GKY reviewed documentation and data
from the Town and met with certain departments and divisions involved in the Town's processes,
but not Plaintiff himself because they were told there was an "ongoing personnel issue." *Id.* at 20-
25, 28-31. However, Fritz has stated that GKY "did not get involved with personnel issues" and
did not want to know anything about such "because that had no input in our determination of where
everything stood," and further, meeting with Plaintiff "wouldn't have changed anything on how
we dealt with things because what we were looking at was program[s] and projects" and "we do
not have any concern about not meeting [Plaintiff] because we were looking at documentation . .
. [and] a higher level, to determine compliance and what was missing."[8] *Id.* at 20:1-8, 21:16-22:3.

GKY informed Defendant of its preliminary audit findings in July 2023, which indicated
an "extreme number" of differences between reported BMPs and actual existing facilities. SUMF
¶ 57. When Defendant reviewed its GIS mapping, it found an even greater discrepancy. *Id.* Fritz

---

[7]     Plaintiff denies the Fritz and Minnick's description of the audit's purpose, noting that his work was the
subject of the audit given his role in the stormwater management program and he was the only person terminated as a
result of the audit. RDSF ¶ 54.

[8]     *See also* ECF 54-32 at 22:21-23:3 ("I do not believe that anything that came out of our audit would have
changed based on the fact that were looking at the documentation and the coordination amongst all the divisions and
departments."); *id.* at 23:17-24:1, 24:20-25:2 ("the way that things were managed . . . it did not appear to be managed
in a way that would make it every easy to get the answers that we needed to know for anybody . . . . we were able to
identify a lot of the issues that there were concerns about without having to ask questions of the particular person").

and LaFollette identified Plaintiff as responsible for these failures.[9] SUMF ¶ 58. While recognizing that the audit found that the Town was reporting only 223 BMPs while there were actually 449 facilities, ECF 56-1 Ex. 7 ¶ 22, Plaintiff declares that he reported 326 BMPs to DEQ in 2022. PSAMF ¶¶ 11, 12 (citing *id*. ¶¶ 26, 27). Plaintiff did not have the opportunity to review or provide commentary or explanation on the audit's methodology. PSAMF ¶¶ 10, 13.

As a result of the preliminary audit findings, Plaintiff was informed on August 9, 2023 that Defendant no longer had a position for him and that he could retire or resign by August 11, 2023, or be terminated. SUMF ¶ 59. Because he did not timely retire or resign, Plaintiff was informed of his termination on August 12, 2023, effective August 11, 2023. *Id*. Defendant did not consider any alternatives for Plaintiff because "[t]he consensus was that the gravity of this program failure rose to the level of termination." SUMF ¶ 60; ECF 54-36 at 29:15-26:4. No other employees faced termination. PSAMF ¶ 14. Following Plaintiff's termination, on November 13, 2023, the Town Council held a closed session to discuss the state of the stormwater management program and staff's request for a $1.55 million supplemental appropriation to address the audit findings, which Defendant attributed to Plaintiff's failures. ECF 54-27; ECF 54-35 at 20:5-21:13. The next day, the Town Council approved the requested appropriation to address shortcomings in the MS4 program ahead of the permit renewal deadline. SUMF ¶ 62. Plaintiff maintains that the audit and supplemental appropriation were a "sham" and "ruse" to set him up for termination. ECF 54-29 at 275:19-276:10.

### B.    Procedural History

---

[9]      Plaintiff also notes that Minnick and LaFollette supervised Plaintiff and that LaFollette was also disciplined in connection with the audit results. RDSF ¶ 58. Separately, Plaintiff does not dispute that his job description includes responsibility for management of the stormwater management program and MS4 permit. SUMF ¶¶ 6, 7; RDSF ¶¶ 6, 7.

Plaintiff filed suit in this Court on October 28, 2024. ECF 1. In response, Defendant moved to dismiss the original complaint on January 3, 2025, ECF 6, but this motion was mooted by Plaintiff's filing of the Amended Complaint, asserting Title VII race discrimination (Count I - failure to promote, termination) and retaliation (Count II - audit and termination in response to January 26, 2023 and May 8, 2023 reports) claims, on January 30, 2025. ECF 14. Defendant moved to dismiss the Amended Complaint on March 3, 2025, ECF 15, which the Court denied in its entirety on April 18, 2025. ECF 21. Defendant answered the Amended Complaint, ECF 25, and this matter proceeded through discovery, after which Defendant filed its current Motion for Summary Judgment on October 17, 2025. ECF 53. This matter has been fully briefed and, as the Court dispenses with oral argument as it would not assist the decisional process, is now ripe for disposition.

## II.    LEGAL STANDARD

A movant is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact. FED. R. CIV. P. 56(a). In deciding a summary judgment motion, the Court "must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar v. Reston Town Center Property, LLC*, 988 F. 3d 756, 761 (4th Cir. 2021). But the Court should enter summary judgment "against a party who fails to make [an evidentiary] showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Sedar*, 988 F. 3d at 761. "Under this standard 'the mere existence of a scintilla of evidence' in

favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.    DISCUSSION

On the current Motion, Defendant asks this Court to dismiss Plaintiff's Title VII discrimination and retaliation claims in their entirety. ECF 54 at 16, 25.

"Title VII prohibits an employer from both (i) discriminating against an employee on the basis of [race], and (ii) retaliating against an employee for complaining about prior discrimination or retaliation." *Foster v. Univ. of Md.-E. Shore*, 787 F. 3d 243, 249 (4th Cir. 2015). "Plaintiffs may prove these violations either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (cleaned up). Here, the parties agree that the *McDonnell Douglas* framework is applicable, and so if Plaintiff establishes a *prima facie* case for discrimination or retaliation, the burden shifts to Defendant to produce a legitimate nondiscriminatory reason for the adverse action. *Williams v. Ricoh Americas, Corp.*, 203 F. Supp. 3d 692, 697 (E.D. Va. Aug. 2, 2016). For discrimination, the *prima facie* case generally requires Plaintiff to show that he was a member of a protected class, Defendant took an adverse action against him, he had been fulfilling Defendant's legitimate expectations at the time of the adverse action, and the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F. 4th 244, 255 (4th Cir. 2025). For retaliation, the *prima face* case generally requires Plaintiff to demonstrate that he engaged in protected activity, Defendant took an adverse action against him, and the adverse action was causally connected to his protected activity. *Williams*, 203 F. Supp. 3d at 697.

The burden at the first step is "not onerous" and meeting it effectively "creates a presumption that [Defendant] discriminated against [Plaintiff]." *Wannamaker-Amos*, 126 F. 4th at 255. If Defendant carries its burden at the second step, then Plaintiff must establish by a preponderance that the neutral reasons offered by Defendant were "mere pretext . . . by showing both that the reason was false and that discrimination was the real reason for the challenged conduct." *Williams*, 203 F. Supp. 3d at 697. "The final pretext inquiry merges with the ultimate burden of persuading the court that [Plaintiff] has been the victim of intentional discrimination" or retaliation, which "at all times remains with [Plaintiff.].". *Merritt v. Old Dominion Freight Line, Inc.*, 601 F. 3d 289, 294 (4th Cir. 2010).

Bearing these principles in mind, the Court addresses each claim in turn.

### A. Count I – Title VII Race Discrimination

#### 1. Failure to Promote Theory

Count I of the Amended Complaint asserted that Defendant discriminated against Plaintiff on the basis of race by denying him a promotion (Stormwater and Environmental Manager) for which he was qualified, "instead hiring a white man [Minnick] with less experience." ECF 14 ¶ 112. On summary judgment, Plaintiff's prima facie case requires demonstrating that he is a member of a protected group, applied for the position, was qualified for that position, and Defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F. 3d 248, 268 (4th Cir. 2005). Defendant concedes the first three elements, challenging only the fourth part of Plaintiff's *prima facie* case. ECF 54 at 17. Further, Defendant argues that even if the *prima facie* case is established, there is no genuine issue as to Plaintiff not being promoted because he was "not the most qualified applicant," his "background was not the strongest," and "his interview was weak and did not garner

confidence that he would be able to handle some of the tasks which would be required of him as Stormwater and Environmental Manager[,]" which Plaintiff cannot show is pretext. *Id.* at 19, 20. The Court agrees.

Here, there can be no genuine dispute that Plaintiff's non-promotion did not occur under circumstances giving rise to an inference of unlawful discrimination. Plaintiff claims that an inference arises from LaFollette, who he asserts was the decision-maker, harboring racial animus to Plaintiff, pointing to her responding to his challenge of his 2018 performance evaluation by telling stories about "inner city Black kids" who she worked with in Ohio for summer camps who were "stubborn" at first and became "easy going" by the end of the summer. ECF 56 at 14 (citing ECF 56-1 Ex. 5 103:1-20). He also observed that LaFollette seemed uncomfortable around him, speedily walking or running past his office and refusing to look him in the eye at meetings, which she did not do with anyone else. ECF 56 at 15 (citing ECF 56-1 Ex. 5 159:13-160:6, 160:10).

Assuming *arguendo* Plaintiff's perceptions[10] and his assertion that LaFollette was the decision-maker, none of this constitutes any meaningful evidence of discrimination in non-promotion. To the former, no reasonable juror could believe that LaFollette's stories were indicative of discriminatory animus. In any case, such statements made in 2018 are not relevant to an employment action made five years later. *See Rios-Grajales v. Bondi*, 2025 WL 2484169, at *9 n.4 (D. Md. Aug. 28, 2025) (citing *Birbeck v. Marvel Lighting Corp.*, 30 F. 3d 506, 511–12 (4th Cir. 1994)) (observing discriminatory statements "remote in time" to adverse action are not sufficient evidence of discrimination and rejecting mocking of Plaintiff's accent as direct evidence

---

[10] Plaintiff has noted that LaFollette has a different account of the "inner city kids" story. ECF 56 at 14–15 (citing ECF 56-1 Ex. 6 39:13-40:16). Notwithstanding that Plaintiff's own testimony on this incident is not as straightforward as he argues in opposition to Defendant's Motion, *see* ECF 56-1 Ex. 5 103:1-20 (stating multiple times "I'm just paraphrasing right now" and "I'm not sure of all the details"), the Court will make no credibility determinations and accepts Plaintiff's characterizations on this point for the sake of analysis.

where four and two-year gap to adverse action existed); *Hood-Wilson v. Bd. Of Trs. of Comm. College of Balt. Cnty.*, 2024 WL 4893641, at *9 (D. Md. Nov. 26, 2024) (similar rejection under burden-shifting prima facie analysis). Moreover, Plaintiff's impressions as to LaFollette being "uncomfortable" around him constitute nothing more than rank, unsupported speculation concerning "disagreements and misunderstandings that are ordinary occurrences in a workplace setting" that may not be imputed racial character simply based on Plaintiff's say-so.[11] *Hawkins v. PepsiCo, Inc.*, 203 F. 3d 274, 280-81 (4th Cir. 2000); *see also Andrews v. Va. Polytechnic Inst.*, 2020 WL 714234, at *11 (W.D. Va. Feb. 12, 2020) (collecting cases). Plaintiff's contentions as to LaFollette do nothing to establish his *prima facie* case, and for this reason, Plaintiff's failure to promote claim must fail.

Further, even if the *prima facie* case is established, Defendant has carried its burden to put forth a legitimate non-discriminatory reason for not promoting Plaintiff, based on him not being the most qualified applicant or having the strongest background and his flagging interview performance. ECF 54 at 19, 20; ECF 54-30 at 32:6-17, 33:14-34:3, 36-37:5, 37:10-20, 38:15-22; ECF 54-34 at 45–46, 58–61. The burden returns to Plaintiff to establish pretext by "showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank*, 434 F. 3d 249, 259 (4th Cir. 2006). But Plaintiff's arguments as to his and Minnick's qualifications and Defendant's reliance on interview assessments do neither.[12]

---

[11]     The same is true as to the 2018 inner city kids story.

[12]     It is unclear whether Plaintiff's position on these points is directed towards the *prima facie* case or establishing pretext after Defendant puts forth a legitimate reason for non-promotion. *See* ECF 56 at 15–17. The Court understands his position bears on both, although as discussed herein, his contentions are wholly unavailing regardless at what stage of the *McDonnell Douglas* process they are considered at. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000) ("Whether judgment as a matter of law is appropriate . . . will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case . . .").

Plaintiff relies on his own "substantial managerial experience" and the "disparity in technical qualifications" between Minnick and him to insist that his qualifications are "demonstrably superior." ECF 56 at 16. This claim that he was "more qualified than [Minnick] for the [Stormwater and Environmental Manager] position lacks evidentiary support." *Hood-Wilson*, 2024 WL 4893641, at *10. It is undisputed that Minnick's managerial experience, including in stormwater management related functions, far exceeded that of Plaintiff. *Compare* PSAMF ¶ 1; ECF 56-1 at TOL2080–81; ECF 54-29 at 41–43 *with* ECF 54-19; SUMF ¶ 19. While Plaintiff takes issue with Minnick's lack of "engineering degrees or experience," it is undisputed that the Stormwater and Environmental Manager position did not outright require such and allowed for the "equivalent combination of education and experience." SUMF ¶ 20. Plaintiff does not clearly suggest that Minnick did not possess such equivalent combination, nor does he rebut LaFollette's assessment that Minnick did have such combination and that it outstripped Plaintiff's experience. ECF 54-30 at 36-37:5, 38:15-22. Moreover, despite Plaintiff complaining of the "highly subjective" assessments of his interview performance as unsubstantiated by written documentation and inviting discrimination, to the extent that such assessments are actually subjective,[13] it is permissible for Defendant to utilize subjective factors in promotion decision-making, *Green v. Duke Energy Corp.*, 2004 WL 727036, at *5 (M.D.N.C. March 30, 2004), there is nothing remotely untoward evident from Defendant's subjective assessments, and Plaintiff does no more than to offer unsupported speculation as to the "real" reasons for Minnick's selection.[14] *See Bonds v.*

---

[13]    It is not so clear that all of LaFollette's account of Plaintiff and Minnick's interviews is subjective. ECF 54-30 at 32:6-17, 33:14-34:3, 37:10-20. But the Court accepts Plaintiff's characterization for purposes of analysis.

[14]    Plaintiff contends that the Town's proffered subjective reasons are suspicious because of the lack of interview notes from LaFollette and because the notes of other interviewers do not contain negative assessments and document his experience and qualifications. ECF 56 at 17 (citing ECF 56-1 Ex. 4). However, all of the interview notes produced in discovery, regardless of interviewer (including LaFollette) or interviewee, were made on a template consisting of the same questions asked of each candidate and merely recorded each candidates' answers to each. ECF 56-1 Ex. 4; ECF 60-3. None of the notes contain interviewer's impressions of a candidate's performance. *Id.*

*Leavitt*, 629 F. 3d 369, 386 (4th Cir. 2011) (plaintiff may not establish pretext by "focusing on minor discrepancies that do not cast doubt on the explanation's validity").

Far short of establishing his prima facie case, pretext, or carrying his ultimate burden, Plaintiff at most shows that he was a comparable candidate to Minnick in some ways, but not others, and offers nothing in the way of unlawful discrimination—but this does not suffice as a matter of law. *Cf. Heiko*, 434 F. 3d at 261–62 ("When a plaintiff asserts job qualification that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer."); *see also Evans*, 80 F. 3d at 960–61 ("Evans simply has failed to demonstrated that she was more qualified . . . 'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff."). While Plaintiff certainly disagrees with Defendant's decision not to promote him to Stormwater and Environmental Engineer, the undisputed facts do not show that such a decision was illegal. Plaintiff's failure to promote theory fails.

### 2. Audit and Termination Theory

Count I also states that Defendant discriminated against Plaintiff by subjecting him to an audit and terminating him on the basis of his race. ECF 14 ¶ 12. Plaintiff's *prima facie* case requires him to show that he was a member of a protected class, had satisfactory job performance, suffered an adverse employment action, and was treated differently from similarly situated employees outside his protected class. *Coleman v. Md. Ct. of App.*, 626 F. 3d 187, 190 (4th Cir. 2010). Defendant denies that Plaintiff can make the showing as to the second and fourth elements, pointing to the events leading to the initiation of the audit and the audit's eventual results as to the former, and contending that Plaintiff cannot establish any comparators as to the latter. ECF 54 at 21–25. Plaintiff counters, arguing that the audit itself is an adverse employment action; separately

pointing to his performance reviews from Mr. Jones as establishing his performance and insisting on disparate treatment compared to LaFollette; and claiming that procedural flaws in the audit and Defendant's exaggerated financial impact claims establish pretext. ECF 56 at 18-23.

The Court assumes without deciding that the initiation of the audit, including seizure of Plaintiff's laptop and suspension of access to network drives, ECF 54-24, constitutes adverse action. *See Russo v. Bryn Mawr Trust Co.*, 2024 WL 4748643, at *4 (3d Cir. Aug. 9, 2024) (assuming without deciding that suspension with pay constitutes adverse action, post *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)). Regardless, whether the relevant action is the initiation of the audit or Plaintiff's ultimate termination, Plaintiff cannot establish his *prima facie* case, nor can he establish pretext in the face of Defendant's legitimate rationale for its personnel actions.

First, there can be no genuine dispute as to whether Plaintiff was satisfactorily performing at the time of the audit in May 2023 or his termination in August 2023—he was not. Plaintiff does not dispute that upon beginning as Plaintiff's supervisor in February 2023, Minnick had concerns with Plaintiff's performance as to inaccurate reporting, late work product, lack of project management, contact with an outside consultant in violation of the chain of command, blaming others for not completing tasks, scheduling time off when critical tasks were due, and allowing a certification part of the MS4 permit to lapse.[15] SUMF ¶ 42; RSDF ¶ 42. There can also be no dispute that as Minnick reviewed the stormwater management and MS4 programs that Plaintiff was responsible for, Minnick found it difficult to get the information he sought from Plaintiff,

---

[15]    Plaintiff did not object to this fact, although the Court also observes that Plaintiff submitted a declaration in which he offers unresponsive or conclusory explanations for Minnick's concerns, ECF 56 at 27; ECF 56-1 Ex. 7 ¶¶ 16–21, and claims that Minnick "overly scrutinized" his work at the direction of LaFollette. SAMF ¶ 6 (citing ECF 56-1 Ex. 5 at 207:22-208:20; 214:14-18). Plaintiff also testified that Minnick was "never satisfied with anything" Plaintiff offered and that Minnick "sometimes" ignored his emails to offer additional assistance, citing one singular example just prior to the audit's initiation. PSAMF ¶ 7 (citing ECF 56-1 Ex. 5 at 212:12-22, Ex. 9, Ex. 10). None of this creates a genuine issue as to satisfactory performance. Importantly, Plaintiff's own assessment of whether he was meeting Defendant's expectations is irrelevant. *King v. Rumsfeld*, 328 F. 3d 145, 149 (4th Cir. 2003).

SUMF ¶ 44, and the audit was initiated due to the program discrepancies that Minnick discovered. Further, the audit results confirmed that Plaintiff's performance was not meeting Defendant's expectations.[16] SUMF ¶ 58, 59. To all of this, Plaintiff focuses only on his positive performance evaluations from Mr. Jones in 2021 and 2022 (for the year ending May 13, 2022). ECF 56 at 18, 19. But accepting these evaluations as accurate at the time they were made, they do not create a triable issue because "what is relevant is how [Plaintiff] performed in May [or August] 2023, not how he performed [twelve and twenty-four] months prior." *Blanch v. Hexagon US Federal, Inc.*, 2025 WL 4997644, at 8 (E.D. Va. Oct. 15, 2018) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 56 F. 3d 542, 547 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996) (rejecting reliance on eleven-month old performance review, observing "the Fourth Circuit held that a 1990 performance evaluation assessing an employee's performance in the latter part of 1989 was 'irrelevant because [the employee] was not performing well in August of 1990'").

Nor can there be any dispute that Plaintiff has not shown different treatment from similarly situated employees who are not Black with regard to termination.[17] Plaintiff contrasts his termination without consideration of alternatives with that of LaFollette (white), who received discipline in the form of notation of the audit findings on her last three performance evaluations (as of her August 2025 deposition) and an unwritten memorandum of expectation by the Town manager's office, and whose termination was requested by "at least one individual" but not realized. RDSF ¶ 58; ECF 56-1 Ex. 6 at 63:19-64:6. Although Plaintiff is not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim, because he

---

[16]    Plaintiff raises numerous arguments as to the audit's procedures and findings, which fail for the same reasons articulated below as to pretext.

[17]    Plaintiff does not raise any differential treatment arguments as to the audit as an adverse action and there is no record evidence that would establish such. For this additional reason, he has not established his *prima facie* case as to that theory.

rests the fourth element of his *prima facie* case upon comparison to an employee from a non-protected class, he must show that the comparator is similar in all relevant respects. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Plaintiff cannot make this showing, however, because he agrees that LaFollette was his indirect supervisor two levels above him and the Public Works Director overseeing sixteen different departments and 75 employees. SUMF ¶ 10; RSDF ¶ 10; ECF 56 at 22. There can be no dispute that she did not deal with the same supervisor, was not subject to the same standards, did not have the same job responsibilities and did not have day-to-day responsibility for the stormwater management and MS4 programs, and did not engage in the same conduct without differentiating or mitigating circumstances that would distinguish her conduct or Defendant's treatment of her and Plaintiff.[18] *Haywood*, 387 F. App'x at 355. To the extent that Plaintiff also argues that Defendant's proffered explanation is pretexual because Defendant did not impose progressive discipline for the audit findings contrary to policy, ECF 56 at 27, it is true that "[e]vidence that a company failed to follow its own disciplinary policies in firing an employee can be probative of pretext," *Wannamaker-Amos*, 126 F. 4th at 260, but that policy did not prohibit Plaintiff's termination or require progressive discipline, and Plaintiff does not show how his termination is not proportional to the seriousness of his conduct.[19] *Cf. id*. at 260–61 (recognizing that termination in the face of employer policy of progressive discipline except in cases of "serious acts" defined in part as "deliberate and intentional" misconduct was probative as an "extreme overreaction" where evidence did not indicate prior discipline or intentional misconduct).

---

[18]     Plaintiff does not argue that Minnick is a comparator, nor does the Court consider him one because there is no suggestion that he had any role in the conduct examined by the audit.

[19]     Defendant's policy states that "disciplinary actions shall be proportional to the seriousness of the violation and shall generally be progressive in nature." ECF 56-1 Ex. 16.

Accordingly, Plaintiff fails to establish his *prima facie* case as to his audit or termination discrimination theory. Even so, Defendant again establishes a legitimate reason for the audit or termination in the program discrepancies that were the impetus of, and further compounded by, the audit and its findings. Notably, Fritz and LaFollette identified Plaintiff as responsible for the identified program failures, SUMF ¶ 58, Plaintiff does not dispute that his job description includes responsibility for management of the stormwater management program and MS4 permit, *id*. ¶¶ 6, 7; RDSF ¶¶ 6, 7, and it is undisputed that Plaintiff was informed that he was being terminated on the basis of the audit findings. SUMF ¶ 59.

In turn, Plaintiff again fails to show that this reason is pretextual because it is false and discrimination was the real reason for his termination. *Williams*, 203 F. Supp. 3d at 697. Plaintiff asserts that there is "a genuine issue as to whether the audit was itself a discriminatory act designed to justify a predetermined outcome" because of "procedural irregularities" as Plaintiff was not permitted to participate in the audit, the auditor was told that Plaintiff was not available due to a "personnel issue" by some unknown person for some unknown reason, and "every other employee who had worked on the MS4 program was interviewed by the auditor."[20] ECF 56 at 20–21. But Plaintiff does not dispute that GKY was selected because it is a known leader in the regulatory space throughout Virginia and Defendant had no prior relationship with it such that its assessment was that of an independent third party. SUMF ¶ 49; RDSF ¶ 49. Plaintiff does not dispute the fact that the auditor testified that meeting Plaintiff would not have changed things because the audit focused on the program as a whole and its data and documentation, ECF 54-32 at 20:1-8, 21:16-22:3; *see also supra* n.8, except to speculatively assert without evidence that "the auditor asked

---

[20]     Contrary to Plaintiff's assertion and citation, it is not established that "every other employee" who worked on MS4 was interviewed. ECF 56-1 Ex. 11 at 22:11-20. Rather, the auditor met with "individual departments and divisions based on what their job component was." ECF 54-32 at 20-25, 28-31.

[and] thus believed it was necessary to speak with Plaintiff." RSDF ¶ 56. And, even as Plaintiff also argues that the auditor's claim that only 223 BMPs were reported to DEQ despite Plaintiff's prior reporting of 326 facilities, he does not account for the remainder of the 449 actual BMPs identified by the auditor, and his other qualms with the audit are largely speculative, unsupported, and conclusory.[21] ECF 56-1 Ex. 7 ¶¶ 27–34.

In all of this, there is nothing to suggest that the audit findings were not in fact the reason for Plaintiff's termination or that discrimination actually motivated the audit and termination. Plaintiff's criticism is centrally that the audit was "inadequate" in various ways, "[b]ut focusing on the quality of internal investigations misses the point." *Cupples v. AmSan, LLC*, 282 F. App'x 205, 210 (4th Cir. 2008). Federal courts do not "sit as a kind of super-personnel department weighing the prudence of employment decisions . . . [o]ur sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* (cleaned up) (citing *DeJarnette v. Corning, Inc.*, 133 F. 3d 293, 299 (4th Cir. 1998)). If Defendant's reason for termination is not forbidden by law, "it is not our province to decide whether the reason was wise, fair, *or even correct*, ultimately, so long as it was truly the reason for [Plaintiff's] termination." *Id.* (cleaned up) (emphasis in original); *see also DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.,* 268 F. App'x 236, 242 (4th Cir. 2008) ("[p]retext is a lie' or cover up, not merely a mistake. Therefore, evidence that [defendant] 'erroneously or even purposely misapplied [its own] policy,' will not suffice to overcome summary judgment.."). It is clear that the audit formed the true cause for

---

[21] Plaintiff also argues that the Town's $1.55 million appropriation establishes pretext as an exaggeration, after-the-fact justification because the Town did not provide any documentation that would establish a nexus between the expenditure and Plaintiff's work. ECF 56 at 23. It is true that there is no documentation or breakdown showing how such appropriations were used to remedy deficiencies. However, such fact does not show the $1.55 million figure was a post-hoc pretextual justification because there is a clear nexus to the expenditure in a general sense as the audit findings underlying Plaintiff's termination were cited in the Town Council's resolution approving the appropriation. ECF 54-28. Moreover, there is simply no other evidence that would suggest the appropriation was a fabrication "designed to make Plaintiff's alleged performance issues appear more severe than they actually were."

Plaintiff's termination by Defendant. *Holland v. Wash. Homes, Inc.*, 487 F. 3d 208, 217 ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible."). At bottom, the undisputed evidence does nothing to substantiate Plaintiff's insistence that the underlying audit was a discriminatory "ruse" and "sham," even if GKY's findings were wrong in some way.

For these reasons, Count I fails as a matter of law and will be dismissed.

### B. Count II – Title VII Retaliation

In Count II, Plaintiff alleges that he reported racially discriminatory behavior against him to Defendant on January 26, 2023 (on notice of non-promotion) and May 8, 2023 (on notice of audit) and in turn Defendant retaliated against him by subjecting him to a baseless audit and terminating him. ECF 14 ¶¶ 17, 18. Plaintiff's *prima facie* case as to Count II requires him to show that he engaged in protected activity, Defendant took an adverse action against him, and the adverse action was causally connected to his protected activity. *Williams*, 203 F. Supp. 3d at 697.

On the *prima facie* case, Defendant challenges Defendant's assertion of protected activity on January 26, 2023, and the causation element. ECF 54 at 26–28. If the *prima facie* case is established, Defendant avers, as before, that it had a legitimate non-retaliatory reason for terminating Plaintiff in Plaintiff's creation of deficiencies leading to and substantiated by the audit of the stormwater management and MS4 programs, *Id*. at 28–29 and further insists that Plaintiff cannot show pretext. *Id*. at 29, 30. Plaintiff rejects Defendant's position. ECF 56 at 23–27.

Plaintiff's retaliation claim falters with the *prima facie* case. Regarding protected activity, Defendant denies only that Plaintiff's January 30, 2023 email to LaFollette, sent after being informed of non-promotion, expressing that he was "clearly not valued" can be protected activity because it has no relation to racial discrimination. *Id*. at 26. Plaintiff insists that "magic words" are

not required and that his January 30 complaint placed Defendant on sufficient notice "particularly in light of his prior complaints of race discrimination throughout his tenure at the Town." ECF 56 at 24, 25. The Court disagrees with Plaintiff for the most part. All that is required for a complaint to constitute cognizable protected activity is for it to be understood or reasonably understandable by the employer as opposing employment discrimination in the context in which it was made. *Burgess v. Bowen*, 466 F. App'x. 272, 282 (4th Cir. 2012). With or without the prior complaints, which this Court is not privy to because Plaintiff omitted them from the record,[22] the January 30 email has nothing to do with race discrimination, and everything to do with Plaintiff's dismay at not receiving the manager position because of his qualifications and service history with Defendant. ECF 54-22. Thus, Plaintiff's May 8, 2023, report to HR director Didawick following being informed of the audit several days prior, which contended that Minnick was targeting Plaintiff based on race and nationality, constitutes the only protected action in this matter. SUMF ¶ 51.

Turning to causation, Plaintiff cannot establish that element either. Plaintiff relies solely on the temporal proximity between the May 8, 2023 complaint and his August 11, 2023 termination. SUMF ¶¶ 50–51, 59. But where, as here, Plaintiff's only evidence of causation is the fact that he was "fired [three] months after [he] accused [Minnick] of discrimination," the Fourth Circuit has "noted that a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation'" and preclude establishment of the *prima facie* case.[23] *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361,

---

[22]    ECF 56 at 25; RDSF ¶ 32; PSAMF ¶ 2. (citing ECF 56-1 Ex. 5 199:4-16, which is not present in the deposition excerpt attached to Plaintiff's opposition).

[23]    Plaintiff raises *Hollis v. Morgan*, 153 F. 4th 369, 384 (4th Cir. 2025) for the proposition that a three-month gap is sufficient to establish causation. ECF 56 at 25. But *Hollis* held so for purposes of pleading on a motion to dismiss, and the court did not rely on temporal proximity alone but also relied on the fact that immediately upon the filing of the protected EEO complaint at issue, the defendant began processing an appeal that had been "pending for

364 (4th Cir. 2005) (two month gap insufficient); *see Perry v. Kappos*, 489 F. App'x 637, 643–44 (4th Cir. 2012) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("mere temporal proximity" must be "very close" in order to establish causation for *prima facie* case)) (rejecting establishment of *prima facie* case where causation rested upon "three-month lapse . . . without more"). Moreover, the evidence belies any notion that the initiation of the audit itself constitutes adverse action for Count II because the audit was initiated prior to Plaintiff being informed of such on May 2, 2023 and his filing a complaint, which in part referenced the audit, ECF 54-22, on May 8, 2023. The same fact further diminishes any inference of causation as to termination, which came about as a result of the audit's findings.

Thus, Plaintiff fails to establish his *prima facie* case as to his retaliation claims. Even so, the parties advance arguments regarding Defendant's burden to put forth a legitimate rationale for termination and Plaintiff's burden to establish pretext that are essentially the same as discussed as to Count I's termination discrimination theory.. ECF 54 at 28–30; ECF 56 at 25–27; ECF 60 at 19–20. The Court has incorporated such points into its discussion of Count I's termination discrimination theory and for the reasons previously stated, the Court finds that notwithstanding Plaintiff's failure to establish a *prima facie* case on retaliation, summary judgment is further warranted on Count II because there is no genuine dispute that Defendant's proffered reason for Plaintiff's termination is legitimate and not pretextual.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby

---

months" and which would ultimately result in the plaintiff's demotion." *Id*. And, while Plaintiff also cites *Carter v. Ball*, 33 F. 3d 450, 460 (4th Cir. 1994) for the same proposition as to the *prima facie* case on summary judgment, the Fourth Circuit recognized in *Shields v. Fed. Exp. Corp*., 120 F. App'x 956, 963–64 (4th Cir. 2005), that *Carter* came before the Supreme Court's decision in *Clark County*, "casting some doubt on the extent to which we can use a four-month gap alone as sufficient proof of causation."

ORDERED that Defendant's Motion for Summary Judgment (ECF 53) is GRANTED; and it is further

ORDERED that this matter is DISMISSED with prejudice.

**IT IS SO ORDERED.**

The Clerk of Court is directed to forward a copy of this Memorandum Opinion and Order to counsel of record and to close this civil action.

/s/
_____
Michael S. Nachmanoff
United States District Judge

January 29, 2026
Alexandria, Virginia